**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
------------------------------------------------------------- X
SANDRA BETTERS,                                                :
                                                               :       Civil Case No.:
                               Plaintiff,                      :
                                                               :
               v.                                              :       **COMPLAINT**
                                                               :
NARDIN ACADEMY, MARSHA SULLIVAN,                               :
MICHAEL LAWLEY, FRANK EWING, LUKE                              :
JACOBS, CHARLIE CHIAMPOU, PATRICIA                             :       **Jury Trial Demanded**
LORENCE, KENT LORENCE AND THERESE                              :
FORTON-BARNES                                                  :
                                                               :
                               Defendants.                     :
------------------------------------------------------------- X

        Plaintiff Sandra Betters ("Dr. Betters") hereby alleges, by and through her undersigned

counsel, Wigdor LLP, as and for her Complaint against Defendants Nardin Academy ("Nardin,"

"Academy" or the "School"), Marsha Sullivan ("Ms. Sullivan"), Michael Lawley ("Mr. Lawley"

or "Trustee Lawley"), Frank Ewing ("Mr. Ewing" or "Trustee Ewing"), Luke Jacobs ("Mr.

Jacobs" or "Trustee Jacobs"), Charlie Chiampou ("Mr. Chiampou"), Trish Lorence ("Ms.

Lorence"), Kent Lorence ("Mr. Lorence") and Therese Forton-Barnes ("Ms. Forton-Barnes")

(together, "Defendants") as follows:

## PRELIMINARY STATEMENT

        1.      In July 2021, after a rigorous hiring process and unanimous approval by the Board

of Trustees, Dr. Betters became the President of Nardin Academy, the oldest independent Catholic

school in Western New York.

        2.      Nardin Academy – and the primarily affluent Buffalo, New York community that it

serves – boasts that it is "a school of academic excellence grounded in the values and philosophy

of our Catholic faith." Nardin identifies its values as being "welcoming and celebrating all," "cultivating connection" and serving the world with "dignity, humbleness and compassion."

3.     Nothing could be further from the truth. Dr. Betters was faced with a school community full of hatred, vitriol, hysteria and retaliatory intent. Board of Trustees members screamed in her face, threatened her and knowingly spread mistruths about her; faculty members secretly recorded her, spread private and sensitive information about the mental health of her child (who was a student at Nardin) and wrote false complaints in an effort to get Dr. Betters removed from her position; and community members, fueled by lies and false rumors, repeatedly defamed her online and in the media.

4.     Why? Because Dr. Betters refused to turn a blind eye to the significant – and often unlawful – issues she discovered after she began serving as the President of Nardin Academy.

5.     First, Dr. Betters discovered that the Academy was facing a precarious financial situation fueled by several significant financial improprieties, including: (i) exorbitant unauthorized spending by Ms. Sullivan; (ii) self-dealing on the part of several Board members and Academy staff; (iii) the unlawful use of monies received pursuant to the Paycheck Protection Plan and (iv) the fact that the "budget" that had been approved by the Board did not account for many required expenses.

6.     Second, Dr. Betters discovered that while Nardin Academy enjoys an impressive academic reputation, there were only 11 credentialed faculty members in the Upper School, its Principal lacked credentials as *either* an educator or an administrator, the faculty's performance was not properly evaluated, there had not been a program of studies in place for several years and the Academy did not meet the minimum number of school days to qualify for the aid the School

accepted and used.  All of this contributed to academic results that were on the decline well before Dr. Betters arrived at Nardin.

7.     Third, although Dr. Betters was ostensibly hired in part due to her commitment to implement much-needed Diversity, Equity and Inclusion ("DEI") initiatives, many faculty members, staff, Trustees and community members were fiercely opposed to any diversity initiatives.  Dr. Betters discovered that prior to her arrival, the School failed to interview people of color for open positions despite receiving applications for each one; that although the School hired a Director of Diversity, Inclusion and Opportunity, the position did not have a job description or goals; and that the Academy had largely ignored years of student surveys and a social media campaign that indicated significant concerns by and harassment of students of color.

8.     Notably, when she was hired, Dr. Betters was told that Nardin was looking for a leader to carry out the DEI promises previously made by Ms. Sullivan and the Board of Trustees; create a desperately needed curriculum for the School after Ms. Sullivan and former Upper School Principal (and current President) Rebecca Reeder ("Ms. Reeder") made the decision to opt out of the New York Regents curriculum and failed to replace it with another formal program of studies; and create a new strategic plan.

9.     Yet, when she attempted to work toward the goals she was hired to meet, Dr. Betters met intense and furious resistance.  As Dr. Betters continued to ask questions and push for change, it became evident that a powerful group of individuals at Nardin was becoming increasingly concerned that Dr. Betters would not kowtow to their threatening and aggressive behavior and that she would continue to discover the nefarious practices happening behind the scenes at Nardin.

10.     As Dr. Betters got closer to the truth about the financial and operational state of the

School, she continued to report her serious concerns to the Board of Trustees.  The more Dr.

Betters complained, the louder the false complaints made about her grew. Nobody could have

predicted what would follow – a mass hysteria fueled by lies, rumors and hate that was so

outrageous, so unbelievable and ultimately so dangerous that Dr. Betters was subjected to actual

death threats.

**From:** Emily Rose Pratt <emilyrosepratt7@gmail.com>
**Date:** May 4, 2023 at 10:21:04 PM EDT
**To:** sbetters@nardin.org
**Subject: Re: WATCH YOUR ASS**

On Thu, May 4, 2023, 10:18 PM Emily Rose Pratt <emilyrosepratt7@gmail.com> wrote:
WE AS A GROUP OF PARENTS ARE AGGRAVATED BY YOUR IGNORANT DECISION/S AND TAKING ACTION....YOU HAVE UNTIL MONDAY TO NOT SHOW YOUR FACE AROUND OR WE WILL TAKE ACTION AND MAKE SURE YOU
WILL NOT SEE YOUR FUTURE ALONG WITH THE OTHERS THAT RUINED THIS SCHOOL.....THERE ARE MORE OF US AND SOME YOU HAVEN'T MET NOR SEEN BUT WE KNOW WHO YOU ARE AND YOUR LOOKS AND
DESCRIPTION SO WALK CAREFULLY AND LOOK OVER YOUR SHOULDERS OR SOMETHING OR SOMEONE WILL HANDLE YOU.......

11.     Yet, throughout all the lies being spread, the hate being spewed and the defamatory

attacks on her personal and professional character, Dr. Betters was guided by one principal – what

was best for Nardin – and she continued to make decisions accordingly.  As a result, she continued

raising questions about the Academy's financials and blowing the whistle on what she learned;

she continued to work to improve the diversity and equity at the School; and she continued

pushing the faculty and administrators to enhance their teaching so the students at Nardin received

the education they deserved.

12.     It would later become clear that the false complaints made against Dr. Betters were

part of an orchestrated campaign to silence and force her out of Nardin.  The complaints led to

two separate investigations – one by a committee created by the Board and one by outside

counsel.  Both investigations confirmed without question that Dr. Betters' detractors were utterly

unable to articulate any claims against her; instead, they relied upon rumors and faux outrage. The

investigations also found that, without a doubt, Dr. Betters had not engaged in any misconduct or wrongdoing.

13.    Yet, not surprisingly, Dr. Betters' detractors were undeterred by the findings, because those leading the charges against her did not actually care about whether Dr. Betters performed well at her job; they simply wanted to stop her from asking questions and instituting necessary changes at Nardin.  They ensured that by firing her in breach of her employment agreement.

14.    Defendants' conduct has violated Plaintiff's rights under Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), New York Not-for-Profit Law § 715-b *et seq*. ("NYNPL"), New York Labor Law § 740 *et seq*., New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq*. ("NYSHRL") and the New York False Claims Act, Art. 13 of the NYS Finance Law ("NYFCA").  The conduct described herein also constitutes defamation and a breach of Dr. Betters' Employment Agreement.

## ADMINISTRATIVE PROCEDURES

15.    Dr. Betters will file a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), an administrative pre-requisite to filing an action under Title VII of the Civil Rights Act of 1964 ("Title VII") and will amend this action to include claims under Title VII at the appropriate time.

## JURISDICTION AND VENUE

16.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under § 1981.  The Court has supplemental jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including certain of the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

18.     Plaintiff Sandra Betters is a resident of the State of New York and is a former employee of Defendant Nardin Academy.  Dr. Betters was employed as the President of Nardin Academy from June 2021 through July 2023.

19.     Defendant Nardin Academy is a domestic non-profit corporation incorporated in the State of New York with a principal place of business located in Erie County, New York.  At all relevant times, Nardin Academy was Dr. Betters' employer.

20.     Defendant Marsha Sullivan is the former President of Nardin Academy and the current Board of Trustees Chair.  As the former President, Ms. Sullivan was instrumental in the financial and operational improprieties at the Academy and part of a larger group of individuals who engaged in retaliatory actions against Dr. Betters because she complained about those financial and operational improprieties.  As Board Chair, Ms. Sullivan was responsible for making the decision to unlawfully terminate Dr. Betters.

21.     Defendant Michael Lawley is a former member of the Board of Trustees at Nardin Academy.  As a Trustee, Mr. Lawley was instrumental in the financial and operational improprieties at the Academy and part of a larger group of individuals who engaged in retaliatory actions against Dr. Betters because she complained about those financial and operational improprieties.

22.     Defendant Frank Ewing is a former member of the Board of Trustees at Nardin Academy.  As a Trustee, Mr. Ewing was instrumental in the financial and operational

improprieties at the Academy and part of a larger group of individuals who engaged in retaliatory

actions against Dr. Betters because she complained about those financial and operational

improprieties.

23.     Defendant Luke Jacobs is a current member of the Board of Trustees.  As a

Trustee during Dr. Betters' employment, Mr. Jacobs was part of a larger group of individuals

who engaged in retaliatory actions against Dr. Betters because she complained about those

financial and operational improprieties.  Mr. Jacobs was also responsible for making the decision

to unlawfully terminate Dr. Betters.

24.     Defendant Charlie Chiampou is a current member of the Board of Trustees.  Mr.

Chiampou was also responsible for making the decision to unlawfully terminate Dr. Betters.

25.     Defendant Patricia Lorence is a former faculty member at Nardin Academy.  Ms.

Lorence knowingly and publicly shared private and sensitive health information about Dr.

Betters' child and made defamatory statements about Dr. Betters that she knew were untrue.

26.     Defendant Kent Lorence is the spouse of Defendant Patricia Lorence and engaged

in repeated acts of defamation against Dr. Betters that he knew were untrue.

27.     Defendant Therese Forton-Barnes is a Nardin Academy alum who led the Nardin

Together efforts to oust Dr. Betters.  In doing so, Defendant Forton-Barnes made multiple

defamatory statements about Dr. Betters both online and in the media.

## I.     NARDIN'S PREVIOUS ADMINISTRATION DRIVES THE ACADEMY TO THE BRINK OF EXTINCTION

### A.     The Nardin Academy

28.     In 1857, the Academy was founded by the Society of the Daughters of the Heart

of Mary ("DHM"), which is a world-wide congregation of vowed religious women (*i.e.*, nuns

who have taken vows of poverty, chastity and obedience).

29.     Nardin, which educates students from pre-K through grade 12, is the oldest independent Catholic school in Western New York.

30.     The Academy is made up of four schools: (i) the Montessori School; (ii) the Lower School; (iii) the Middle School and (iv) the Upper School.

31.     The sole "member" of the legal entity of the Academy is the U.S. Provincial of the DHM, who is currently Elizabeth Dodge ("Ms. Dodge").  Oversight of the Academy is left in the hands of a Board of Trustees and a President who reports to the Board.  Upon information and belief, Ms. Dodge was recently forced to request a sabbatical as a result of the harassment and trauma she endured throughout Dr. Betters' employment.

32.     Among its five "foundational values," Nardin purports to aim to "Embrace All" (*i.e.*, to "welcome, recognize and celebrate all") and "Live & Serve Through Faith (*i.e.*, "strive to live and serve our world with dignity, humbleness and compassion").

33.     Nardin claims to produce graduates who "lead with . . . integrity" and "champion equity and justice."

34.     However, as Dr. Betters would learn shortly after assuming the position of President of the Academy in 2021, the prior leadership (including the former President, Ms. Sullivan; former Upper School Principal and Vice President of Academics, Ms. Reeder and various former Trustees), faculty, staff and even parents and community members have failed – and in many cases continue to fail – to live up to Nardin's alleged values, including those of "inclusion," "equity," "justice," "integrity," "dignity, humbleness and compassion."

35.     Dr. Betters' predecessor, Ms. Sullivan, occupied the role of President of the Academy from 2018-2015 and 2016-2021.[1]

---

[1]     Nardin hired John Thomas West III to lead the School from 2015-2016 school year.  His tenure was a disaster and Ms. Sullivan was brought back for the 2016-2017 school year.

36.     While Ms. Sullivan was and still is largely revered by the Nardin community, the reality is that during her tenure, the Academy saw significant declines in enrollment and academic success.

37.     As for the former, enrollment at the Upper School had been in decline from the 2018-2019 year until Dr. Betters' arrival, and overall enrollment was also down for the 2019-2020 year before Dr. Betters' arrival.

38.     As for the latter, prior to Dr. Betters' arrival: (i) Nardin's average SAT scores had fallen behind those of local peers; (ii) Nardin's AP test scores had dropped and (iii) K–4 and 5–8 reading scores were lower than expected (based on Measure of Academic Progress benchmarks) which went hand-in-hand with Ms. Sullivan and Ms. Reeder's decision to remove the Academy from the Regents curriculum and subsequent failure to replace it with another program.

39.     In addition, as described in more detail below, Ms. Sullivan left the School in financial distress and a budget deficit.  In fact, with the exception of the 2020-2021 school year, the Academy ran at a deficit every year from the 2017-2018 school year until Dr. Betters' arrival.

40.     What Dr. Betters did not and could not know when she accepted the position as President is that Ms. Sullivan and several others purposely hid the state of the Academy from several board members, staff and parents.

**B.     Irresponsible and Rampant Overspending Driven by Unchecked Conflicts of Interest**

41.     Unbeknownst to Dr. Betters at the time of her hire, she was walking into a school that was in a very precarious financial position.

42.     As would be expected, throughout the hiring process Dr. Betters continually asked about the "gap" between tuition revenues and the Academy's operating budget.  This figure is extremely important because it dictates the amount of money that an institution will have to raise

to avoid operating at a deficit (as Nardin had prior to Dr. Betters' hire).  The number is perhaps even more important at Nardin than other institutions because Nardin's endowment is relatively insignificant in comparison to the "gap."

43.  Dr. Betters was repeatedly assured by the Trustees that the "gap" was small and surmountable given the Academy's ongoing fundraise.  This representation turned out to be false.

44.  Throughout the hiring process, Dr. Betters was told that the Academy was in the midst of the largest fundraising campaign in its history.  The campaign was being led by Trustee Michael Lawley, Ms. Sullivan and the outgoing Vice President for Institutional Advancement, Katie Naughton ("Ms. Naughton").

45.  As it turned out, there was no possible way that the fundraise would generate enough revenue to cover the "gap."  This was confirmed by a third-party consultant, Gonser Gerber, who determined that the maximum that could be raised was far less than the amount being promised by Trustee Lawley, Ms. Sullivan and Ms. Naughton.

46.  Nevertheless, Trustee Lawley and Ms. Sullivan convinced the Board to go along with their projections and approve a budget based on an impossibly optimistic fundraise.

47.  To make matters worse, while Ms. Sullivan and Ms. Naughton both assured Dr. Betters and the Trustees that they would stay to see the fundraising efforts completed, they promptly departed Nardin after not coming close to meeting their campaign goals.  For his part, Trustee Lawley raised less than $100,000 while Dr. Betters was president, and the fundraiser ended up falling short by almost the exact amount as had been predicted by Gonser Gerber.

48.  As a result, the Academy, which was already running at a deficit, was doomed to run at even a larger deficit for the 2021-2022 school year.  Ultimately, the Academy operated at

an over $1,000,000 deficit in 2021-2022 because of the decisions and malfeasance of the prior administration and Board, which put Nardin's total debt at more than $4,500,000.

49.     This debt has been exacerbated by: (i) exorbitant unauthorized spending on the part of Ms. Sullivan; (ii) self-dealing on the part of Board members and Academy staff; (iii) the unlawful use of monies received pursuant to the Paycheck Protection Plan and (iv) the fact that the "budget" that had been approved by the Board did not account for many required expenses.

50.     To begin, one of the primary causes of Nardin's debt is its past illicit dealings with Mod-Pac, a local manufacturer of packaging materials, and its former Chairman, Kevin T. Keane ("Mr. Keane"), a local industrialist.  In or around 2015, in a purported showing of support for Nardin, Mr. Keane donated $1,000,000 to the Academy, for which, upon information and belief, he benefited from a tax perspective.  At the time, Mr. Keane had a friend on the Board – his accountant, the then-Board Chair and current Board member, Mr. Chiampou, who serves as the Chair of the current Finance Committee.

51.     Shortly thereafter – consistent with a deal brokered by Trustee Lawley and Ms. Sullivan without the knowledge of the full Board, but with the knowledge of Mr. Chiampou – Nardin turned around and wrote Mod-Pac a $1,000,000 check.  The payment to Mod-Pac was made as the first of a series of ongoing payments to the company in "exchange" for which it cleaned up and repurposed its own land.

52.     Nardin went on to pay millions more to Mod-Pac, including with monies received from the federal government as part of the Paycheck Protection Program ("PPP"); money, of course, which was legally required to be earmarked for employee salaries.

53.     While the land at issue was arguably repurposed for the benefit of Nardin (it was turned into a sports field and indoor athletic center used by the Academy), the primary

beneficiary of the transaction was Mod-Pac, which retained ownership of the land and was able to obtain tens of millions in tax credits in connection with the project.

54.     Moreover, as Dr. Betters would later learn, Nardin's agreement with Mod-Pac required *the Academy* to pay property taxes on the repurposed property that it did not even own. What is more, the agreement, created by Ms. Sullivan and Trustee Lawley on behalf of Nardin, required the Academy to pay 50 percent of the costs to fix property damage on the site, even damage caused by Mod-Pac, whose manufacturing facility also is on site.

55.     Nardin's payments to Mod-Pac contributed millions of dollars to the Academy's debt long before Dr. Betters arrived.

56.     By way of another example of self-dealing, most, if not *all*, of Nardin's insurance policies are underwritten by Lawley Insurance.  Lawley Insurance is run by Trustee Lawley, which presents an obvious conflict of interest.  Dr. Betters' professional experience caused her to question the extent and cost of the insurance Nardin maintained because she had never seen an organization similar to Nardin pay for as much insurance as the Academy was paying Lawley Insurance to provide.

57.     Another blatant conflict of interest concerns Melissa Sheehan ("Ms. Sheehan"), Nardin's former Chief Technology Officer.  Ms. Sheehan is the wife of Jerry Sheehan, who is the Chief Executive Officer of SynchroNet Industries Inc. ("SynchroNet"), an Internet Technology ("IT") solutions company.  Not surprisingly, given this relationship, Nardin pays SynchroNet to handle all its IT needs.

58.     In addition, Dr. Betters discovered that over the years, the technology budget grew exponentially, and that hundreds of thousands of dollars were being spent on unnecessary technology.  This, too, went completely unchecked by the previous administration.

59.     As described in further detail below, Dr. Betters repeatedly raised concerns about the Academy's improper, unauthorized and conflict-ridden spending.  Also as described in detail below, throughout her tenure, the Board retaliated against her for doing so and took various steps to stymie Dr. Betters' efforts to reduce or eliminate the budget deficit, including, among other things: (i) a refusal to increase tuition even just enough to keep up with projected inflation; (ii) a refusal to authorize the replacement of the Academy's Chief Financial Officer and Upper School principal and (iii) resistance to layoffs that would put Nardin in line with other private schools in terms of its teacher to student ratio.

60.     Despite continuing to receive tremendous resistance in response to her efforts to balance the budget, Dr. Betters was able to cut the School's deficit in half in just one year. Indeed, during her tenure, Dr. Betters secured $2.1 million in employee tax credits and a $250,000 grant for student supports, and reallocated Title Funds to uncover tens of thousands of dollars that were not being utilized for Math and Science and school security.

## C.     Nardin's Sordid History of Race Relations and Protests Against Institutional Racism

61.     The administrators, faculty and student body at Nardin have, historically, been predominantly white.

62.     It would be an understatement to say that over the years, Black members (and prospective members) of the Nardin community have experienced institutional barriers to admission and success as well as overt racism.

63.     On June 2, 2020, just over one week after George Floyd was murdered, Nardin students started an online petition targeted at eliminating the institutional racism and other discrimination that has existed for well over 100 years at Nardin.

64.    The petition reads in part:

    i.    "[R]acism is alive and well in America, and so it is at Nardin. Minorities—such as students of color, LGTBQ+ students, low-income students, and many others—experience aggression and discrimination from peers, faculty, and administration."

    ii.    "[S]tudents of color, especially Black students, are disproportionately labelled as the aggressor simply for speaking out."

    iii.    "In Nardin's Anti-Harassment Policy, specifically in the Anti-Bullying subsection, there are no specifically outlined routes for students to take to report incidents of racial discrimination."

    iv.    "In the past, students have felt neither comfortable nor heard in reporting such incidents, and have seen little to no action taken in response to their reports."

    v.    "Currently, Nardin is not diverse; admissions and administration must acknowledge this and avoid featuring students of color solely for the purpose of attracting prospective students. This is a practice known as Tokenism, and is yet another form of oppression faced by people of color in the media and popular culture."

    vi.    "Nardin currently has two teachers of color. Nardin also currently has no Black teachers. Students of color are not seeing themselves reflected in the faculty, and therefore do not feel as included in the decisions made by this faculty."

    vii.    "Nardin has a history of muted responses to issues surrounding race and discrimination."

65.    Over 10,000 people signed the students' petition, and many of them wrote in the comments section about their own experiences of racism at the Academy.

66.    Five days later, on June 7, 2020, Nardin alumni started their own petition.  The alumni petition reads, in part:

    i.    "We acknowledge that Nardin Academy has upheld an oppressive and racist culture rooted in white supremacy that has alienated, ignored, harassed, and bullied students and alumni who are from marginalized communities."

14

ii. "For years, students havebeen reporting these issues to staff and administration without an official reporting system to hold the assailant accountable."

iii. "We firmly stand in support of students of color who have been and continue to be victimized by Nardin's hostile environment."

iv. "We acknowledge the years of pain and struggle that many of us have gone through while receiving an education at this institution; more importantly, we acknowledge our complacency and participation in these injustices."

67.    At the same time that these petitions were being published and supported, an Instagram account was opened in the name of "@oppressedatnardin."  Through this Instagram page, students and alumni were able to share their experiences of racism and other forms of discrimination at Nardin.  Some examples are depicted below:

"On our senior trip to Disney a group of white girls started posting 'LANK' on all social media platforms. Me and a group of my friends (who were also white), were on our way to a park and I heard someone say, 'let a n\*\*\*\* know'. I turned to see the group of girls all saying it proudly. I was very bothered about it and went back to school the first day and told our _____ and was told to 'let it go' and not let such 'little things' bother me."

- Elizabeth P., Class of 2017

"I attended in the late 90s/early 2000s. The wealthy suburban girls were treated much better than most of the minority students and students from the city by the teachers. This was likely because they had stay at home moms who could volunteer at events and befriend the faculty, while my mom had to work full time. These girls were often granted leniency on dress code violations and bullying. In a feeble attempt to fit in as a young teenager, I bought a knockoff designer purse. A teacher grabbed it off my desk during class and proceeded to list off the reasons she knew it was fake in front of everyone. I was humiliated, and I realized that no matter what I did, I did not belong at Nardin."

- Anonymous -

"They segregate and create class sections with all white and non-white students. They take you to field trips and assign minorities with minority parents and white students with white parents. They take money from well to do Asians and sponsor white students with 3-4 kids to study faith through financial Aid. They intentionally do not give opportunity to minority students in any theatrical or musical events. It's all white selected. I am done with Nardin and they wasted my parents money"

- Anonymous -

"I was in 10th grade and I was sitting in the classroom waiting for class to start. As people were walking in this one white girl walked in and said with her whole chest, 'WE ARE THE DOMINANT RACE', then looked straight at me. She tried telling me that she didn't mean it but she was giggling under her breath…"

- Morgan H., Class of 2019

"I went to Nardin Elementary for 8 years and my mother and I were a big part of the Nardin community. I was one of four African-American students in my class and could be called the token. Unsurprisingly, I still continued to be the token even though I no longer went to the school. I was asked to be the other speaker for Fortune and I was also told that I spoke so eloquently and that I knew how to speak well in front of large crowds. However, the real micro-aggression occurred to my mother who happened to be sitting in the lobby area. Be mindful that my mother and I are well known by the Nardin community. However, when the President, Ms. Marsha Sullivan, arrived to the function she automatically assumed that she was working coat check and asked her if she was taking coats and tried to hand my mother her coat. I was deeply disappointed and disgusted by this and couldn't believe that it happened."

- Nardin Elementary, Class of 2016 -

"When applying to colleges I was discouraged from applying to colleges I was interested in and was told by a staff member, 'You should set the bar low unless you want to play the diversity card.'"

- Anonymous -

"When talking about how we were going to have a black president, [redacted] said she didn't want a 'monkey' running our country."

- Kryshessa S., Class of 2015 -

"I got constantly called the n word."

- Class of 2019 -

Another situation that happened during a progress meeting with the [redacted] was that my daughter reported to the [redacted] an incident during history class where they were learning about the civil war and slavery. During the class a few of the caucasian students began saying the N word to the three Black students, which included my daughter. When I asked my daughter why the teacher didn't say or do anything her response was 'They never do anything to the kids whose families sit on the Board.' When I addressed this to the [redacted] during our meeting he asked my daughter who the students were and stated that he would address it. Nothing was done about it. There is surely an element of elitism in this school and there is also some unfairness that happens and all of these things need to be addressed.

- Parent of Class of 2021 -

68.    On July 16, 2020, the Academy responded to petitions *via* an email that promised to prioritize diversity and inclusion, anti-racism efforts, social justice and racial equality.

69.    Dr. Betters would later come to learn that the promises made in this letter were little more than lip service.  Even at the time, that fact was known and spoken about by students at the Academy:



"I am one of four students working with Nardin on reforming its community or culture to be actively anti racist since the petition (which was signed by 10k people). Students and alumni have brought so many problems to the attention of the Nardin community, but now I feel the need to come forward to say how white leaders in power have put the least amount in cooperating to make change.

We students who wrote the petition have been ignored and disrespected in the following ways:"

1

We asked them to make some simple, clearly outlined policy changes but the administration refused, saying that these changes would be complicated and take time to write. The four of us just made the policy changes ourselves in the span of a few hours and sent it to them. They had nothing to say.

2

The new diversity statement, anti-discrimination policy and dress code policy WE wrote, Nardin is now calling its "great movement towards change." Yet Nardin has not acknowledged our work. When asked if she would credit us students for their labor and ideas, Marsha Sullivan directly said 'I think it was a collaborative effort… I think we all wrote the policy.' All but one of us are POC. White adults are basically stealing from majority POC students. It's so frustrating.

3

The burden is on students of color to explain why Nardin's policies and practices are racist. They refuse to do research on their own, which could be as simple as a Google search. At times when we've said something is racist, the white administrators simply say that it's not racist to them. It's racial gaslighting and white supremacy, plain and simple.

4

They haven't told us about any of their plans, despite this information being made available to the public via news outlets and emails to alums. WE started the conversation, WE did the work, WE even wrote the policy, we literally did their jobs for them and now they're taking credit. And they have the nerve to pat themselves on the back for all the 'great work' they're doing and the 'important conversations' they're having, when in reality they're just trying to silence our voices and spin the narrative.

They don't want to make things better for students of color, they want to do self-improvement work for their school image. But they won't keep us down, and we won't stop fighting."

16

D.    **Nardin Takes State Money, But Fails to Comply with State Education
      Requirements**

70.    Each year Nardin receives approximately $300,000 to $500,000 in New York

State funds.  These funds, referred to as "Mandated Service Funds," including Title Funds, are

generally earmarked for specific types of expenditures.

71.    In order to be eligible to receive New York State funds, schools such as Nardin

must submit annual certifications to the New York State government that, *inter alia*, attest to the

School's compliance with New York's Education Law.

72.    Each year, Nardin would submit annual certifications to the New York State

government that attested to its compliance with New York's Education Law even though Nardin

was actually in violation of various aspects of the Education Law.

73.    By way of example only, in order to receive full funding, the Academy is required

to provide 180 days of instruction.  In violation of this requirement, the Academy only provides

150-160 days of instruction.

74.    Upon information and belief, in order to receive full funding, the Academy

engaged in fraudulent reporting concerning the number of days of instruction (which was the

responsibility of Nardin's Chief Financial Officer, Greg Altman ("Mr. Altman"), including by

inputting false information into the State Aid Management System and presenting inaccurate

calendars as backup for this false reporting.

75.    In addition, the School has regularly misused the funds it has received from the

state.  By way of example, certain funds earmarked for "enrichment" were used to fund trips,

such as one to New York City, where the students went shopping, and other to a beach.  The

individual at New York State responsible for overseeing the auditing into the use of these funds

would later tell Dr. Betters that "Nardin gets red flagged all of the time."

76.     Another decision that has contributed to the decline of Nardin's success in educating students was Ms. Sullivan and Ms. Reeder's decision to have the Academy opt-out of the New York State Regents curriculum without replacing it with any formal program of studies. Under New York State law, if a school opts out of the Regents program, it must replace it with a formal program of studies that is substantially equivalent.

77.     Indeed, from 2016-2021, Nardin had <u>no</u> formal program of studies and had failed to even apply for or receive accreditation (a precondition to operating).  Instead, Ms. Sullivan just repeatedly requested extensions of the deadline to become accredited and institute a formal program of studies.  When Ms. Sullivan requested an extension for the third time, it was denied.

78.     As such, when Dr. Betters was hired, she inherited a complete mess as far as the Academy's curriculum and accreditation was concerned.  When she joined, she had less than one year to get the School accredited – a process that itself generally takes two years.  Although she was ultimately able to accomplish that, as described in detail below, her efforts to do so were met with remarkable pushback from many members of the faculty and Board even though accreditation was required to keep the School open.  To this day, the Academy has not replaced the Regents with any formal program of studies.

79.     To make matters worse, while many of Nardin's educators are well qualified, others literally are not qualified at all.  It starts at the top with Colleen Robertson ("Ms. Robertson"), the Principal of the Upper School.  When Ms. Robertson was hired, she not only had no teaching credentials (degrees or certifications) but did not even have any administrative credentials.  Among other issues, this later became a huge problem for Dr. Betters when she was trying to work with Ms. Robertson and others to develop a curriculum for the Upper School.

80.     Many Academy teachers likewise had no degree or certifications in education.  In fact, only 11 members of the faculty in the Upper School self-reported that they were certified during the accreditation process.

81.     Far from being a secret, the fact that teaching credentials were unnecessary was not only well known at Nardin but actively advertised in job postings.  For example, below is a recent post from a member of Nardin's faculty advertising an open teaching position.  The teacher expressly states that no certifications are needed to obtain the position.



## II.    DR. BETTERS IS HIRED WITH UNANIMOUS SUPPORT OF THE BOARD OF TRUSTEES AFTER A RIGOROUS HIRING PROCESS

82.     Prior to becoming the President of Nardin, Dr. Betters had significant experience as an educator and administrator.  Immediately prior to joining Nardin, Dr. Betters led an all-girls Catholic school for several years during which she restructured the academic program, created a comprehensive social-emotional learning wellness program, led strategic planning, managed budgets and focused on establishing equity and anti-racist policies.

83.     Dr. Betters was also in the final stages of completing her Doctorate in Education Policy and Leadership with a focus on social justice and anti-racism.

84.    In addition to Dr. Betters' experience in creating and fostering DEI initiatives, she was also an experienced educator – something that the previous Nardin President was not – and she had the experience and knowledge needed to facilitate academic growth and curriculum development, mentor and develop faculty, and ensure compliance with state-required standards.

85.    As noted above, at the time Nardin was searching for its next President, the School was embroiled in accusations by former and current students involving issues of racism and discrimination.  As such, it is not surprising that the hiring committee claimed to be searching for a new President who would make DEI initiatives a priority.

86.    Almost immediately after providing her resume to the search firm tasked with finding Nardin's president, Dr. Betters was asked to interview for the position because, as she was told, her qualifications were such a close match to what Nardin was looking for in its next President.

87.    Indeed, during Dr. Betters' first interview, the hiring committee spent a significant amount of time discussing DEI topics.  The hiring committee made it clear to Dr. Betters that the next president would be expected to carry out the DEI promises made by Ms. Sullivan and the Board of Trustees, which, to that point, had been largely ignored.  The new President would also be expected to implement DEI programs, increase staff diversity, create a curriculum for the School, and create a new strategic plan.

88.    Based on the hiring committee's representations, Dr. Betters was very excited about the opportunity to be part of an institution that intended to make DEI initiatives a priority, as it aligned with her professional experience, academic focus and personal values.

89.    Thus, when she was offered the position after a unanimous vote by the Board of Trustees, Dr. Betters was thrilled to be the next Nardin President.

90.     Unfortunately, almost immediately after she began her tenure, Dr. Betters realized that not only were many of the people in positions of power at Nardin not interested in DEI initiatives, but they were also actively opposed to it.

91.     It was not long before Dr. Betters realized that almost everything she was told about Nardin during her interview was a lie, and that many of the people in power would go to extreme lengths to maintain the status quo and hide the nefarious practices that had been happening at Nardin for decades.

III.    **DESPITE BEING HIRED TO IMPLEMENT CHANGE, DR. BETTERS WAS MET WITH FIERCE RESISTANCE AND DENIED THE ABILITY TO IMPLEMENT NECESSARY CHANGE**

A.      **Dr. Betters is Refused Access to Routine Financial and Administrative Documents**

92.     Immediately after starting her employment, Dr. Betters began asking for financial and administrative documentation so she could get a full picture of the state of the School.

93.     As detailed above, Dr. Betters was assured that Nardin was in a stable financial position when she interviewed for the position.  However, as Dr. Betters gained access to and began reviewing the financial records of the Academy, it became evident that Nardin was in significant financial distress.

94.     She discovered that the Nardin Upper School enrollment had been declining since at least the 2018-2019 school year, and that the overall Academy began experiencing a steady decline in enrollment since at least the 2019-2020 school year.

95.     As a result of declining enrollment and other factors, the Academy, which had been running at a deficit since at least the 2017-2018 academic year, was doomed to run at even a larger deficit for the 2021-2022 school year.[2]

96.     When Dr. Betters realized the financial state of Nardin, she began asking pointed questions and was regularly rebuffed and refused access to relevant financial information by Mr. Altman.

97.     Dr. Betters discovered that Mr. Altman was regularly presenting financial information using self-created spreadsheets with hand-selected information rather than providing the whole picture provided by reports run by the financial software in place.  This was not standard practice.

98.     This practice, however, allowed Mr. Altman to tailor the financial information in such a way that many Board members and administrators did not have a full understanding of Nardin's financial practices.

99.     In the Spring of 2022, Dr. Betters presented to the Executive Board her concerns with Nardin's financial practices.  She outlined her concerns that the School was in significant and unexplained debt in addition to paying significant interest.

100.    In the Summer of 2022, Dr. Betters then met on multiple occasions directly with David Beaton, the then Chair of the Finance Committee, to report her concerns that Mr. Altman was providing fraudulent financial information to the Board.  Mr. Altman continually refused to provide any clarification or explanation to Dr. Betters.

101.    Dr. Betters also reported the fraudulent financial practices to the Investment Committee and, ultimately, the entire Board.

---

[2]     Nardin experienced one academic year with an operating gain (2020-2021), which is attributable to additional funding received and other cost savings during the COVID-19 pandemic.

102. During a financial committee meeting, Mr. Altman stated outright that Nardin used PPP loans to fund capitol projects (this had occurred prior to Dr. Betters' hire).

103. Mr. Altman also publicly announced that Mr. Lawley directed him to use employee tax retention credit funds (provided to employers who retained employees during the COVID-19 pandemic), to pay off capital debt.

104. Dr. Betters openly protested this fraudulent use of PPP and Covid-19 relief funds, the latter of which had only been applied for and received at Dr. Betters' urging, which angered Board members.

105. Given that Mr. Altman regularly withheld important information from Dr. Betters despite her repeated requests, Dr. Betters then spoke to the Board of Trustees about removing Mr. Altman from his position.

106. The Board of Trustees, several of whom, upon information and belief, were benefiting from Mr. Altman's selective financial reporting, refused to allow Dr. Betters to do so.

107. The financial committee further rejected Dr. Betters' proposal to reduce the 2023-2024 deficit by increasing tuition by 3 percent (less than the expected rise in inflation). Notably, the tuition rates for the 2021-2022 and 2022-2023 school years increased by 6 percent and 5 percent respectively; and the tuition rate increased by as much as 9 percent in the 2017-2018 and 2018-2019 school years. Upon information and belief, these large increases were used to cover Ms. Sullivan's financial mismanagement.

108. Given Dr. Betters' subsequent discovery of the rampant self-dealing and conflicts of interest surrounding Nardin's financial situation, it became evident why Mr. Altman refused to provide her with the necessary documentation and why she was not permitted to make the changes necessary to stabilize Nardin's finances.

109.    That was only further reinforced in December 2022 when Dr. Betters was

informed by Nardin's auditors that Mr. Altman was also refusing to provide them with the

necessary financials.  The auditors raised significant concerns about Mr. Altman's work, yet Dr.

Betters was still unable to get approval to terminate his employment.

**B.    Nardin Academy Ignored Student Surveys Indicating the Extent of Student Dissatisfaction, Especially for Students of Color**

110.    Based on her interview process, Dr. Betters was obviously under the impression

that increasing diversity and inclusion would be one of her main priorities at Nardin.

111.    Yet, Dr. Betters was not informed that Nardin conducted student climate surveys,

which are understandably useful in determining how students feel about the School environment

and could help direct any future efforts to increase diversity and inclusion.

112.    Dr. Betters first learned of the surveys from the Academy's then Director of

Diversity, Inclusion, and Opportunity, Kendra Brim ("Ms. Brim"), and immediately sought

access to the results.  Despite receiving push back, Dr. Betters was finally given access to them

and discovered just how much work was needed at Nardin for the Academy to meet its stated

goal of inclusivity.

113.    As she learned when reviewing the survey results, in 2020, the Education

Collaborative of Western New York conducted a consortium-wide student assessment of the DEI

climate of Nardin.

114.    There were 377 student respondents; approximately 12% of the respondents

identified as students of color.

115.    The assessment found that Nardin students scored above **all** other participating

schools on two scales: intent to leave and attitudes about diversity, meaning that more Nardin

students indicated (1) an intent to leave; and (2) negative attitudes about diversity at the Academy than students at any other school that participated in the assessment.

116.    The assessment should have triggered deep reflection and action plans. Yet, as Dr. Betters learned, very few people were ever made aware that the assessment existed and absolutely no efforts were made in response to the outcome.

117.    Among other recommendations, based on the responses received, the assessment recommended (1) formal statements of the School's commitment to DEI; (2) reinforcement of the School's low tolerance for offensive humor across all stakeholders, including students, teachers and staff; (3) clear procedures to report harassment or discrimination; (4) efforts to inform students about accommodations available; (5) efforts to display images of people from different racial groups in non-stereotypical and non-traditional roles; (6) exposing students to adults with a variety of backgrounds including race and class and (7) ensuring that the correct pronunciations of names are learned and used.

118.    Students were provided the opportunity to provide written feedback.  Some of the responses including the following: (1) "the advertising displays Nardin as having a diverse student body, when in reality it is the opposite,"; (2) "[t]here is a severe lack of diversity at Nardin…the entire staff is Caucasian…they are so ignorant of the weight of racial slurs and the plights of minorities…using the n-word as frequently as a pause in a sentence, regardless of how it is spelled, is not okay,"; (3) "[t]here is an immensely small amount of diversity at this school and it is SHOCKING," and (4) [w]hile the teachers are respectful, almost every person is white or Caucasian. There is no one with personal experience to whom students can relate…[there is an] overwhelming lack of inclusion and support for students that are part of the LGBTQ+

community. I know students who have been personally attacked, primarily by religion teachers, for their identities."

119.    In the Spring of 2021, still prior to Dr. Betters' arrival, Nardin commissioned another anonymous feedback survey about the DEI climate of the Academy.  A total of 232 students entered their ID in the survey with a total of 204 students answering at least one question.  Of the students who provided responses, 145 identified as white and 25 identified as students of color.

120.    The survey again found that students of color had a less favorable rating of the School's climate for diversity, less positive views about diversity concerns being reflected in Nardin's policies, a lower sense of belonging and a much higher intent to leave the School.

121.    The survey also found that students of color had a significantly greater frequency of negative experiences and much less satisfaction with the way they were treated at Nardin.

122.    In addition, when asked whether they agreed that the School had clear disciplinary procedures to address issues of harassment or discrimination, only 58 percent of students said yes; and when asked whether they agreed that the School had adults from different backgrounds that students could look up to, only 42 percent agreed.

123.    Further, by way of example only, 65 percent of students agreed that teachers at Nardin had difficulty pronouncing non-American names, 37 percent said students' verbal comments sometimes indicated a lack of respect for minority group members, 28 percent agreed that they heard offensive jokes and stories about people from minority groups and 37 percent said that they often hear students engage in humor that may be rude or offensive to people from minority groups.

124.     When students were asked whether there was anything additional that they wanted to share, several students raised issues around diversity.  For example, students identified the following concerns, among others: the administration denied the formation of a student-led Gay-Straight Alliance group; white students were heard degrading students of different racial, ethnic and religious backgrounds; the School did not appropriately handle situations related to racial slurs by students; many students at Nardin were bullies, ignorant, racist and homophobic; and people who speak up about bullying and racism are often punished.

125.     The 2021 survey results mimicked the 2020 survey in many regards.  Most troubling for a school with declining enrollment, the School consistently scored high for students' intent to leave.  Yet, once again, Dr. Betters discovered that no goals were set in response to the survey results.

C.     **Dr. Betters Attempts to Implement DEI Initiatives and Increase Inclusivity and Swiftly Faces a Furious Response by Several Board Members, Faculty and Staff, and Parents**

126.     Dr. Betters immediately began working with Ms. Brim, an alumnus of Nardin and the first person to hold the position of the Director of Diversity, Inclusion, and Opportunity, who was hired in September 2020, prior to Dr. Betters' tenure.

127.     Dr. Betters assumed that Ms. Brim would have been aware of and given goals around increasing diversity and ensuring an inclusive environment in response to the survey results.

128.     Yet, Dr. Betters quickly realized that although Ms. Brim was given the job title of Director, she had no job description or goals.  Instead, Ms. Brim was primarily tasked with serving as a counselor for students of color who raised issues or concerns even though she was not an educator or therapist.

129.    Ms. Brim, however, was capable of and interested in performing the role she was hired to do and, with Dr. Betters' support and guidance, began creating and instituting DEI trainings for the Board, staff and students.

130.    It was the hope of Ms. Brim and Dr. Betters that beginning this conversation and implementing changes would increase inclusivity, which could be determined by future survey results.

131.    The original training Ms. Brim created simply consisted of looking at the School's mission and history and determining whether Nardin was meeting the stated mission.

132.    Yet, even such innocuous training caused several board members, faculty members and parents to react furiously to Ms. Brim's attempts to bring DEI awareness to the School.

133.    Indeed, within the first month of its implementation, Trustee Luke Jacobs gathered parents at his home to rally for the removal of the new DEI initiatives at Nardin.

134.    Several board members complained also that Ms. Brim and Dr. Betters were just trying to make them feel guilty and were wasting their time.

135.    In August 2021, during Dr. Betters' first address to the entire faculty, an upper school teacher secretly recorded the entirety of the meeting, indicating that within just a few months of Dr. Betters' hiring, she was already being met with distrust because of her emphasis on DEI initiatives.

136.    Then, in the Fall of 2021, during back-to-school night, a parent saw a poster in a teacher's classroom that said: "I don't see race. I am a good person. Translation: I'm going to use my place of privilege to refute and deny the sufferings of those who do not have white privilege while at the same time erasing their personal and cultural history."

137.     The parent circulated a photo of the poster around the Nardin community, falsely

claiming that the posters were all over the School and were the result of Dr. Betters' DEI efforts.

138.     In reality, Dr. Betters was not aware of the poster, nor were similar posters hung

all over the School.

139.     The parent also complained directly to Trustee member Kellie Ulrich ("Trustee

Ulrich") who emailed then-Board Chair Tish Van Dyke about the parent's concern without first

discussing it with either Dr. Betters or Ms. Brim.  Trustee Ulrich explained that the parent was

concerned that the School was teaching critical race theory and that some students would feel

insecure by the language on the poster.

140.     The parent's disproportionate and overwrought response to a poster that the parent

believed was somehow indoctrinating children was a reflection of the larger mass hysteria that

would follow by several Board members and parents.

141.     Regardless, Dr. Betters and Ms. Brim continued to work together to place

diversity initiatives on the Board's meeting agenda.  However, whenever DEI training was part

of the agenda, the Board began cancelling the meetings.

142.     On the few occasions that Ms. Brim was given the opportunity to present DEI

initiatives to the Board, she was met with fierce resistance.  The Board would question Ms.

Brim's motives, accuse her of offending people and constantly ask her to re-present her work.

143.     Ms. Brim was subjected to angry and offensive emails from Board members who

accused her of creating problems that did not exist and questioned her motives.

144.     Perhaps not surprisingly, Ms. Brim left her position in June 2022.

145.     When Ms. Brim resigned, Trustee Lawley approached Dr. Betters and told her in a

threatening manner that she better not hire anyone else for the position.  He then invited Dr.

Betters to lunch to discuss the situation.  During the lunch, he stated: "there is no way you are going to hire another one of these people" (*i.e.*, an employee dedicated to DEI) and implored Dr. Betters to "just hire a Black HR employee."

146.    Dr. Betters resisted this racist hiring directive.  Instead, she posted the position and interviewed several candidates before hiring the Academy's current Director of Diversity, Inclusion and Opportunity, Karen Brown ("Ms. Brown"), in October 2022.

147.    Dr. Betters hosted a reception for Ms. Brown so Board members and other staff could meet her.  Outrageously, the Board members opposed to DEI efforts refused to attend.

148.    Unfortunately, Ms. Brown faced even more animosity and hostility than Ms. Brim, likely because she was hired by Dr. Betters.  She, too, received numerous hostile emails from Board members and faculty for simply trying to effectively perform her job responsibilities.

149.    Push back against all DEI efforts continued to increase.  During the Fall of 2022, any DEI trainings or discussions were met with intensified hostility, including staff members openly berating presenters when they attempted to use the student survey results to detail specific issues related to the mistreatment of students of color.

150.    During Board meetings, the conversations became tinged with racist undertones by several board members who conflated lower test scores with increased diversity.  Several board members openly discussed the effects of a more diverse school body.  Trustee Frank Ewing questioned whether enrolling "students of a lesser caliber" was negatively affecting test scores.  It was evident from the conversation that "students of a lesser caliber" was simply coded language for students of color.

151.    In addition to efforts to expand the diversity and inclusivity of the student body, Dr. Betters also pushed to increase faculty diversity.  When she questioned why there was such a

lack of diversity on the teaching staff, she was told that people of color simply were not applying.

152.    However, after doing her own research, Dr. Betters realized that it was not that teachers of color were not applying; it was, instead, that they were not getting chosen for interviews.  Indeed, as Dr. Betters looked at prior applications, it was plainly evident that people of color had been applying for faculty positions at Nardin.

153.    Dr. Betters then hired an outside agency to assist with hiring, ensured that diverse candidates were encouraged to apply and significantly increased the number of employees of color.  As further evidence that people of color were interested in working at Nardin and simply were not being interviewed, every single job listing that Dr. Betters posted received applications from people of color.

154.    Dr. Betters also attempted to increase support for LGBTQIA+ students.  Prior to her arrival at Nardin, student-led groups for LGBTQIA+ students were not permitted; instead, students had to meet with groups at other local schools.

155.    As one student explained in the 2021 climate survey, prior to Dr. Betters' arrival, "[a] few juniors took the initiative to create a student-led GSA [Gay-Straight Alliance], but their preposition [sic] was denied by administration unless it had a name that was 'not gay.'"  As a result, the GSA was "dropped entirely."

156.    Notably, although Nardin is a Catholic institution, the religious order in charge of the School is progressive in its belief that all students should be welcomed, regardless of sexual orientation or gender identity.

157.     Thus, the push back received on creating student-led groups for LGBTQIA+ students and allies was directed by several Board members and parents, not by the religious order itself.

158.     After her arrival, Dr. Betters approved the formation of several clubs, including the Gay-Straight Alliance.  Several parents and faculty members expressed anger over the decision.

159.     Trustee Jacobs also expressed anger that Dr. Betters allowed students to wear uniforms that matched their gender preference, rather than the uniform that matched their biological sex at birth.

160.     A Fall 2022 Family Survey is indicative of the anti-DEI rhetoric espoused by a loud contingent of Nardin parents.

161.     Three hundred parents responded to the survey.  When asked specifically about DEI, some of the responses were particularly telling.  For example: (1) "stop with the social justice and equity teaching – especially in a Catholic school"; (2) "I find it personally offensive and irresponsible that we have spent a 6 figure salary on the new DEI person"; (3) "I'm not in favor of the School pursuing grants for diversity, equity and inclusion (DEI) training.  Nardin is a school founded on Christian values"; (4) "No DEI training could ever take the place of Jesus' teachings in the bible.  I'm concerned Nardin is going woke and have a hard time with [the] idea that my daughter could be indoctrinated into something I can in no way agree with" and the very blunt remark telling Nardin to (5) "[s]top implementing policies which cater to the minority population."

162.    To be sure, there were also parent responses in favor of implementing DEI policies and programs.  However, the vitriol in the responses of those opposed speaks loudly to the environment in which Dr. Betters was working.

163.    With every attempt to increase acceptance and diversity at Nardin, Dr. Betters was subjected to increased hostility and outright anger by several members of the board, parents and faculty members.  Yet, at all times, Dr. Betters was doing exactly what she was told that she was hired to do and making decisions to improve Nardin.

## IV.    DR. BETTERS DISCOVERED THE ACADEMY LACKED MANY CORE REQUIREMENTS FOR A WELL-RUN SCHOOL

164.    Dr. Betters quickly realized that Nardin was significantly lacking several necessities for a well-run school that receives state funding, including a curriculum, certified teachers, a method to evaluate the performance of teachers and administrators, the ability to properly maintain employee records and the required number of school days under New York State law.

### A.    Nardin Academy Failed to Comply with State Law

165.    As detailed above, Nardin made the decision to drop the New York State Regents Program several years before Dr. Betters became the President.  While independent schools are permitted to do so, they are required to replace the curriculum with a specific program of study or become accredited by a verifying body.  Nardin failed to do either.

166.    In addition, as a result of the Academy's decision to eliminate Regents, the School year ended prematurely such that students did not fulfill the state-mandated minimum number of school days.

167.    Dr. Betters immediately flagged this as a significant concern.  When she sought an explanation from the upper school Principal, Ms. Robertson, she was informed that the faculty only work around 150 days per year.

168.    Dr. Betters spoke to Ms. Robertson about the importance of increasing the number of school days given that it was a state requirement, but Ms. Robertson refused.

169.    Dr. Betters questioned Mr. Altman about whether Nardin completed the annual report for New York state, which requires a school to certify the number of school days before receiving funding.  She was unable to get a clear answer or receive access to the forms submitted in prior years.

170.    Upon information and belief, in order to receive full funding, the Academy engaged in fraudulent reporting concerning the number of days of instruction, including by inputting false information into the State Aid Management System and presenting inaccurate calendars as backup for this false reporting.

171.    Dr. Betters also raised significant concerns about the lack of certified faculty members (there were only 11 faculty members on the entire upper school staff who self-reported as certified educators).

172.    Dr. Betters also learned that Ms. Robertson was not a certified educator *or* administrator, nor was she experienced enough to develop the curriculum required to maintain accreditation.

173.    As detailed earlier, when Dr. Betters arrived at Nardin, the School had only seven months left to finish the accreditation process for the Middle States Association Commission on Elementary and Secondary Schools – a process which normally takes at least two years to complete.

174.     Despite very little being done to prepare for the accreditation process, Dr. Betters quickly assembled a team to lead the process.  Under her guidance, Nardin was able to complete the accreditation.

175.     However, once the accreditation process was complete, the Academy was required to complete its curriculum to maintain its accreditation.

176.     Given the importance of completing the curriculum and maintaining accreditation, Dr. Betters asked the teachers to continue working through June (which their contract requires them to do, and they are paid to do), but because the Academy was no longer participating in the Regents program, the teachers were accustomed to ending their school year in early June, and they refused.  Dr. Betters then asked the teachers to return earlier in September to assist in completing it.  They again refused.  Ms. Robertson and the vast majority of the teachers refused to do so and became so angry about Dr. Betters' reasonable request that they complained to the Board.

177.     Ultimately, Dr. Betters had to hire a credentialed educator, Dr. Bobbie Finocchio ("Dr. Finocchio"), as the Vice President of Educational Excellence, to lead the development and implementation of the curriculum because the faculty and administration refused to work additional days to ensure the necessary work was completed and did not believe that a formalized curriculum was necessary.

178.     Fortunately, Dr. Finocchio was a talented and dedicated educator whose area of expertise was curriculum reform and mapping.  With her support, Dr. Betters was able to begin instituting curriculum changes at the Academy.

179.     However, doing so meant that several faculty members, frustrated with increased expectations and change of any kind, began writing emails and letters of complaint to the Board

of Trustees – with the overt encouragement and support of Ms. Robertson – complaining about the changes being implemented by Dr. Betters and Dr. Finocchio.  Again, these changes were being made to comply with New York State law and to bring Nardin into compliance with the most basic educational standards.

**B.    The Administration Refused to Work with and Responded Irrationally to Dr. Betters' Attempts to Implement Necessary Change**

180.    Dr. Betters then realized that the number of faculty and staff was not aligned with the number of students.  This was an issue that had been occurring for several years, but previous administrators simply ignored it.

181.    The Board and Finance Committee also expressed concern over the increase in faculty while student enrollment simultaneously decreased.

182.    Undoubtedly, staff reduction of any kind is a difficult conversation, but it is the responsibility of those in leadership to ensure financial stability for Nardin.

183.    Dr. Betters attempted to raise the issue with Ms. Robertson, Mr. Altman and other administrators so that they could work together to put a plan in place over the next several years.  They refused to engage in the conversation all together.

184.    In September 2022, it was then discovered that several of the students at the upper school had excessive amounts of free time in their schedules, such that some students had up to 4 50-minute study halls a day in addition to 30-minute office hours and a lunch period.  This equated to almost 5 hours of non-instructional time a day.

185.    When asked how that was allowed to happen, Ms. Robertson said that the schedules were created and sent to families without checking them for errors.  Dr. Betters attempted to explain the seriousness of such an error, but Ms. Robertson simply did not believe it was that important.

186.     During the same timeframe, Ms. Robertson instituted a "no cell phone policy" without first communicating the policy change to Dr. Finocchio or the families.

187.     This policy change led to significant strife amongst the students and parents.

188.     Dr. Betters, who was not part of the decision to change the cell phone policy, met with student leaders to better understand their position.

189.     After receiving parent and student feedback, Dr. Betters ultimately decided to tailor the policy change to allow students to use their cell phones during designated periods of the day.

190.     Many faculty members were angered by this decision, as they believed it undermined Ms. Robertson.

191.     Yet, Dr. Betters was making a decision based on parent and student feedback that she believed was best for the School community overall.  Notably, the entire situation could have been avoided if Ms. Robertson informed school leadership about the policy change prior to implementing it, but instead of expressing frustration with Ms. Robertson's ill-informed policy change, the faculty turned their irrational anger toward Dr. Betters once again.

192.     It was then discovered that a student recorded Dr. Betters during her meeting with student leaders about the cell phone policy, which was against school policy.

193.     Inexplicably, several faculty members disseminated the recording to justify their frustration with what they believed was a flawed decision-making process.  The faculty members who did so clearly should have urged the student not to engage in such conduct; instead, they behaved more like children than the students they were tasked with teaching by widely disseminating the recording themselves.

194.     Despite this clear violation of school policy, no faculty members were disciplined.

195.    Dr. Betters continued to have serious concerns about Ms. Robertson's ability to meet the requirements of the Upper School Principal and provide the best academic environment for Nardin students as outlined in her mid-year evaluation and performance improvement plan. Upon information and belief, all written documentation related to Ms. Robertson's performance concerns were removed from her personnel file by the current Interim President, Ms. Reeder.

196.    In March 2023, Dr. Finocchio tendered her resignation in large part due to the negative environment fostered by Ms. Robertson and Mr. Altman.  In her resignation letter, she noted that while she loved working with Dr. Betters and felt supported by her, the work environment was toxic and hijacked by negativity.  She identified that the toxic culture and alignment with DEI was her most significant struggle, as students and faculty were permitted to use racial slurs with little to no consequences; faculty members were permitted to be openly disrespectful to Dr. Betters, including yelling and slamming their fists at her and many Nardin students felt that faculty and leadership did not protect them when injustices occurred.

197.    Dr. Finocchio also noted that it was clear to her that it was not common practice for academic data to be shared with the Board, administrators and teachers, which is unheard of in educational settings.  When Dr. Finocchio did share relevant data, it was unwelcome by school leaders who had no interest in using the data to inform education decisions.

198.    Importantly, Dr. Finocchio also confirmed that Ms. Robertson was an ineffective administrator and did not know how to properly coach educators.  She noted that educators were not equally held accountable for their behavior, that she had to guide Ms. Robertson to give coaching notes to faculty members engaging in unprofessional behavior and that Ms. Robertson mishandled a sensitive student situation by failing to follow mandated reporting laws, which placed a student and the School at risk.

**C.    Dr. Betters Discovered Nardin was Unlawfully Recording and Accessing Private Communications of Staff and Students**

199.    In March 2023, Ms. Sheehan forwarded Dr. Betters an email from the Network Administrator, which included screen captures from a faculty member, Marilou Bebak's ("Ms. Bebak") private email that was accessed on a Nardin computer.

200.    Ms. Sheehan then showed Dr. Betters several other personal text messages and emails from other faculty and staff members.

201.    It became evident to Dr. Betters that the IT staff was directed by Ms. Sheehan to routinely access private communications by faculty and staff members.

202.    When Dr. Betters asked the IT staff why they were accessing private information, they had no sense that it was improper.  It was clear that it had been going on for a very long time.

203.    Dr. Betters then asked Ms. Sheehan to share, "in detail, the process in place that members of your department access an employee's email, device, voicemail, drives, cell phone," and to share the current handbook policy that notifies employees about the process.

204.    More disturbingly, Dr. Betters discovered that the IT department unlawfully turned on and listened to the sound on all of the School cameras.

205.    When questioned, Ms. Sheehan admitted that she had asked IT staff to turn on the sound.

206.    Dr. Betters immediately ordered them to turn off the sound and attempted to begin a forensic IT investigation to determine the circumstances of the recordings being made. However, Dr. Betters was forced out before the investigation could happen.

**V.    THREATENED BY THE CHANGES DR. BETTERS WAS MAKING, SEVERAL FACULTY MEMBERS, ADMINISTRATORS AND BOARD MEMBERS BEGAN AN AGGRESSIVE AND HOSTILE RETALIATORY SMEAR CAMPAIGN TO <u>FORCE HER OUT</u>**

207.    The anger and vitriol espoused by grown adults in response to the changes that Dr. Betters sought to implement at Nardin may appear to just be shockingly juvenile at first glance.  However, their juvenile antics had very real consequences.

208.    Dr. Betters' daughter was a student at Nardin.  In March 2022, Dr. Betters sent an email to Patricia Lorence, one of her daughter's teachers, in her role as a parent that discussed several of her child's personal challenges, including a medical diagnosis.  The letter was respectful and praised Ms. Lorence.

209.    In response, Ms. Lorence widely disseminated the email, *which included private and sensitive information about a minor student*, to other faculty members who in turn widely spread it to their contacts.  It was spread so widely that it was seen by students and other members of the community.  In fact, a community member informed Dr. Betters that the email was even circulated around The Buffalo Club, a local private membership club.

210.    Ms. Lorence apparently made the decision to share an email with private and sensitive information about a child in order to "prove" that Dr. Betters was intimidating her into changing her child's grade.  Yet, the email requested no such thing and, regardless, there is no excuse for an educator to violate a student's legally protected personal information.

211.    The truth, however, did not matter at that point.  Dr. Betters' detractors were so focused on pushing out Dr. Betters that they did not care if they harmed one of their own students.

212.    Ms. Lorance and her husband, Kent Lorance, spread the lie that Dr. Betters asked for her child's grades to be changed repeatedly on social media.  As a result, it continued to

circulate throughout Nardin and the larger Buffalo community, as rumor became fact in the minds of her detractors.

213.    Trustees Lawley and Ewing, along with Trustee Ewing's wife, Leah Ewing, began telling community members, other Trustee members and Nardin employees that Dr. Betters hosted "lingerie parties." Yet, as they were well aware, they began this false rumor after Dr. Betters and other Nardin employees went shopping together at a local boutique (which sold, among many other things, underwear and swimsuits) because the boutique provided 40% coupon codes as a fundraiser for Nardin.

214.    In the Spring of 2022, Trustee Lawley began making repeated calls to Board Chair Van Dyke to complain about Dr. Betters. He reported that a teacher at the Montessori School called him directly to complain that Dr. Betters was not treating faculty well.

215.    However, when Board Chair Van Dyke asked for specific details, they were unable to provide any.

216.    Another member of the Montessori School then sent a written complaint that Dr. Betters rescheduled a meeting four times. When the claims were investigated, it was discovered that while Dr. Betters had to reschedule the meeting once because she was traveling for alumni meetings, the other three meetings were rescheduled at the request of the Montessori School Head.

217.    Once again, the complaints amounted to nothing and were short of actual facts. However, Dr. Betters met with the staff to discuss all their concerns.

218.    A staff member recorded the meeting and sent a copy of the recording to Board Chair Van Dyke who reviewed it and found no concerns with the meeting. The larger concern was why a staff member felt the need to record Dr. Betters during a routine meeting.

219.    In May 2022, 19 Upper School faculty members then wrote a complaint to the Board with ridiculous allegations, including the lie that she asked for her child's grade to be changed.

220.    As a result, Betters was subjected to a 360-performance evaluation, which was the first performance evaluation of an employee in the President position in 12 years.

221.    Much to the chagrin of her detractors, the 360-performance evaluation was positive and did not recommend Dr. Betters' removal.  If anything, it was found that Dr. Betters' direct approach to conversations was off putting to the community and that any discussions she attempted to have about mistakes in the past were seen as direct attacks on Ms. Sullivan.

222.    As a result, the Board hired an executive coach for Dr. Betters, a very common practice under these circumstances.  Dr. Betters was happy to work with the coach, but he then told her that Trustee Lawley was pressuring him to provide information about their sessions.

223.    While the coach said he initially resisted Trustee Lawley's insistence, he admitted to Dr. Betters that he ultimately did share their private communications with Trustee Lawley. The coach explained that he felt indebted to Trustee Lawley because he kept the coach employed during the COVID-19 pandemic.

224.    Not surprisingly, Dr. Betters no longer felt comfortable working with the executive coach.

225.    The School also hosted extensive listening sessions with faculty and staff and thoroughly investigated all faculty complaints.  Ultimately, the faculty complaints were factually wrong, comprised mostly of misunderstandings, baseless rumors and born out of a reluctance to change.

226.    Nevertheless, in September 2022, faculty member Ms. Bebak wrote a letter of complaint to the Board of Trustees stating in sum and substance that faculty morale was low and that there was a "[d]aily atmosphere of being spied upon, threatened and intimidated."

227.    On September 28, 2022, 32 faculty members then signed a letter to the Board of Trustees in which they expressed that they did not have "confidence in the current executive leadership of Nardin Academy."

228.    The letter stated that Dr. Betters was "intent on continuing to foment a culture of intimidation, mistrust, and harassment… ."

229.    The letter was long on accusations and short on facts, to put it mildly, and contradicted itself multiple times, as if the faculty could not even agree on the false allegations being raised.  First, the letter decries Dr. Betters' alleged lack of interest in or contact with faculty, staff and students during her first year of tenure.  It then goes on to complain about "sustained micromanagement of the day-to-day operations of [the] school divisions…[that] has only continued and intensified."  It is difficult, if not impossible, to rectify those complaints.

230.    Indeed, Nardin Academy itself responded to press inquiries and reiterated that the complaints already had been investigated and that the "[c]omplaints now shared publicly are therefore demonstrably false, and possibly defamatory."

## VI.    AS FALSE COMPLAINTS AGAINST DR. BETTERS CONTINUED, BSK WAS RETAINED FOR A FORMAL INVESTIGATION, BUT THE MASS HYSTERIA CONTINUES

231.    The situation was becoming so untenable, that in January 2023, the Academy retained law firm Bond, Schoeneck and King ("BSK") to conduct an investigation to determine whether the personnel, structure, organization, policies, procedures and practices of the Academy's leadership were well aligned with its mission and goals.

232.    BSK was tasked with performing a formal assessment of the entire leadership structure at Nardin, including Dr. Betters and the entire Board of Trustees.

233.    Not satisfied with the pace of the BSK investigation, Dr. Betters' detractors continued to push for her dismissal and cause complete havoc at Nardin while, quite ironically, claiming that they were doing what was best for Nardin and its students.

234.    In April 2023, any simmering hostility toward Dr. Betters and those who were supportive of her leadership boiled over after Dr. Betters put Ms. Bebak, an Upper School Teacher, on paid suspension pending an investigation into a blatantly racist statement made by Ms. Bebak to a Black student in March 2023.

235.    Specifically, after a Black student, upset about a grade, said something akin to "I am so retarded" in reference to herself, Ms. Bebak responded to the child by comparing her use of the word retarded to the use of the word "nigger."  In doing so, Ms. Bebak asked the student how she would feel about being called a "nigger."[3]

236.    Despite the very clear problem with referring to a Black student or any other student as a "nigger," faculty, staff, board members and students used Ms. Bebak's suspension as a rallying cry against Dr. Betters.

237.    Notably, Ms. Bebak was unrepentant about her use of the racial slur.  In fact, in an email to Ms. Brown (the Director of Diversity, Equity and Opportunity at Nardin) and several others, including high school Principal Ms. Robertson, Ms. Bebak stated the following: "[Student] is always upset about something when she comes into class…This was a teachable moment. The R word is just as upsetting to people with a disability as the N word is to people of color. [Student] shouted the R word out to the entire class to call attention to herself and refer to

---

[3]      Ms. Bebak claims that she only said, "the n-word," which, under the circumstances – directed by a white teacher to a Black child – is also abhorrent and racist.

herself as 'I am a R…' That forced me to use the analogy to explain why it is bad to the entire class. I also mentioned that P word for Polish people too. (I am Polish and the P word is just as offensive to me as the N word is to people of color… ."  Quite oddly, Ms. Bebak ends the email by referring Ms. Brown to the Special Olympics YouTube channel and stating that "[t]he word 'Tard' is now trending instead of the R word."

238.    There are, of course, multiple fallacies in Ms. Bebak's line of thought.  First, Ms. Bebak is an adult; the student who referred to herself as a "retard" is a child.  It was certainly a teachable moment in which Ms. Bebak could have shown compassion for a child upset about her grade, check on the student's mental health, and then explain why the term "retard" is unacceptable.  However, a child did not "force" Ms. Bebak to use the word "nigger" (or, according to her story, "the n-word") in a classroom full of children.  The lack of accountability by a grown adult – an educator responsible for teaching children, no less – is truly astonishing. Second, Ms. Bebak's failure to acknowledge the historical connotation of the word "nigger" is incredibly problematic for an educator who should have a stronger understanding of the context of racial slurs.  Finally, Ms. Bebak's clear disdain and lack of compassion for a student who she acknowledges is often upset certainly indicates her general lack of concern about the student.

239.    In addition to the foregoing, it was also reported by another staff member that Ms. Bebak had a history of harassing the student involved.

240.    The staff member reported that Ms. Bebak regularly started confrontations with the student; when told that the student had experienced a fair share of trauma, Ms. Bebak responded that she did not care; when the student was absent because of a rib injury, Ms. Bebak called the student a liar and then went so far as to call the student's cheer company to investigate the matter and that the student's parent had previously asked a staff member to keep an eye out

for the safety of the student while in Ms. Bebak's class because the student was worried about how much Ms. Bebak hated her.

241.    In April 2023, the decision was made to terminate Ms. Bebak's employment.

242.    Not surprisingly, Dr. Betters' detractors falsely claimed that Ms. Bebak's termination was retaliation for complaints she made almost seven months earlier.  Of course, the detractors did not know the entire story, but the facts never mattered much to them anyway. They only cared that it provided them with a rallying cry to further harass and bully Dr. Betters. Notably, as detailed earlier, 32 faculty members complained about Dr. Betters – 31 of the 32 were not terminated.

243.    In the Spring of 2023, several parents started "Nardin Together," a group that claimed it was created to prioritize greater transparency and accountability but was really created to support the removal of Dr. Betters.

244.    Upon information and belief, the group was funded by Trustees Lawley and Frank Ewing who appointed Therese Forton-Barnes to be the face of the movement. Notably, Dr. Betters has never met Ms. Forton-Barnes and she does not have any children who attend Nardin Academy.

245.    Yet, Ms. Forton-Barnes appeared to make it her mission to attack, defame and destroy Dr. Betters.

246.    In numerous social media posts, Ms. Forton-Barnes repeated false allegations, including that Dr. Betters was fired from her previous job, that she made a deal with her previous school to leave quietly so they would not say she was fired, and that her dissertation was written without consent.

247.    Ms. Forton-Barnes also wrote on social media that Dr. Betters' dissertation "actually talks about how she wants to disrupt an all-girls [sic] Catholic school," that Nardin was forced to spend "excessive amounts of money" on hiring Dr. Betters' private security and Dr. Betters' best friend's social media firm – none of which is true.

162.    Upon information and belief, Ms. Forton-Barnes illegally obtained Dr. Betters' embargoed dissertation, which was not permitted to be released because the subjects were minors.  Notably, the subjects were not Nardin Academy students – another fact that Dr. Betters' detractors failed to understand.  Instead, as a result of Ms. Forton-Barnes' illegal distribution of an embargoed dissertation, Dr. Betters work was widely distributed throughout the Nardin community and then falsely accused of failing to get the proper consent for her dissertation, of wanting to disrupt Catholic education and taking advantage of students.

248.    To be clear, Dr. Betters' dissertation studied the importance and effects of implementing self-care into the School day in order to help improve mental health.  It should not be controversial.  Ms. Forton-Barnes, with the full support of Trustees Jacobs and Ewing, purposely made it so to rally the support of Dr. Betters' detractors.

249.    Nardin Together then began an online petition seeking the removal of Dr. Betters littered with false statements and mistruths.

250.    In addition, Nardin Together, including faculty, staff, students and Board Members, then helped organize a planned student walk-out, a planned student walk-in and a community march in protest of Dr. Betters.

251.    During the April 13, 2023 walk-out, students held signs that said, for example, "Down with Betters," "Save the Swamp," "Our Teachers Deserve Better than Betters," and "Can You Change My Grade Too?" while chanting slogans about removing Dr. Betters.

252.    Several faculty members, including Ms. Robertson, participated, as did Mr. Altman and Ms. Reeder.

253.    After the walk-out, a group of nine Board of Trustees members, Kristin Bauer, Davis Beaton, Frank Ewing, Michael Lawley, Christopher Manning, Phil Nobel, Kellie Ulrich, Julie Urban and Tom Zugger, publicly called for the resignation of Dr. Betters and Board Chair Tish Van Dyke who supported Dr. Betters.

254.    In addition, on April 14, 2023, the Keane family announced that it was withholding any financial support for the Academy until the Board of Trustees made a leadership change.

255.    On April 17, 2023, Nardin Academy responded by issuing a statement stating that the nine members of the Board engaged in poor governance that was causing further damage to the School:

> Nine members of the 24-member Board of Trustees of Nardin Academy recently called for the resignations of the School's president, Dr. Sandra Betters, and the Chair of its Board of Trustees, Tish Van Dyke, despite a pending formal independent assessment of Nardin's leadership, including Dr. Betters and the entire Board of Trustees.
>
> The very public nature of the [sic] those demands, numerous misconceptions and half-truths, as well as recent news coverage has been severely damaging to the Academy's reputation and has divided our community.
>
> As an ex officio member of Nardin's Board, I (Elizabeth), have grave concerns about the actions of the minority of the Board who are pressing for Sandra's and Tish's removal. At times, their words and actions have been deeply cruel and damaging. As Trustee Larry Quinn said in a recent email to fellow Board members, 'You have just destroyed the reputation of a very decent, committed woman [Tish Van Dyke], who has spent thousands of hours working on our behalf to help and assist Nardin. The endless string of accusations and innuendo have had their effect, you have broken our chairman

– one of the most decent women I have ever met.' Simply put, this kind of behavior does not hold true to our mission.

--

Now, certain Board members have publicly expressed a desire for the Board to call for the resignations of our school's President and Board Chair before the assessment has been completed by counsel. This rogue statement, released to media without Board consensus or approval, has done further damage to Nardin's reputation. Furthermore, the demands to depart from our agreed upon process have emboldened members of our community to publicly criticize Sandra, and those criticisms have been echoed most recently by some students, in full view of the community served by the School and its stakeholders. This irresponsible behavior has further damaged our school.

--

The demands of some Board members pressuring others for action before the assessment report is released is ill-advised and is simply poor governance. We have no doubt that in their minds, these Board members believe they are acting in the best interest of Nardin. However, their precipitous demands for action are not supported by an appropriate inquiry (and subsequent final report) and demonstrate blatant disregard for our agreed-upon process and, more importantly, the reputation of the beloved and outstanding learning community that Nardin represents.

256.    Nardin's plea for patience and good governance went unheeded.  The nine board members, along with two additional donors – Kenneth and Katherine Koessler, and the Gioia family – threatened to withhold all future contributions until and unless Dr. Betters and Tish Van Dyke resigned or were removed from their positions.  Notably, the Koessler family had not donated to Nardin since 2005, so it certainly was not Dr. Betters that caused the family to stop donating money.

257.    On April 20, 2023, the students held a walk-in in which they wore green and entered the building together.

258.    On April 30, 2023, approximately 200 of Dr. Betters' detractors held another
gathering to again advocate for the removal of Dr. Betters and Board Chair Tish Van Dyke.

259.    Nardin issued the following statement in response:

> We continue to be seriously concerned about the damage Nardin's
> critics are doing to the School they profess to love and support. The
> full board is actively reviewing detailed findings of a third-party
> assessment of school leadership that includes input from more than
> 100 members of the Nardin community. The full board will discuss
> this soon, and continue with its announced "Plan for Healing,
> Growth and Renewal." Everyone wants the divisiveness to end, and
> the focus to be on our students, and an enjoyable end of the School
> year.

260.    But, of course, not everyone wanted the divisiveness to end.   Indeed, on May 1,
2023, the Nardin Together group informed the Board that they had until Friday morning (May 5,
2023) to remove Dr. Betters and Tish Van Dyke.  If the Board refused, the Nardin Together group
said they would not allow their children to return to the School in September.

261.    A group of alumnae who opposed Nardin Together sent a letter to local Buffalo
media on May 1, 2023 decrying the actions of Nardin Together and its supporters.  The letter
expressed concern about the following: that members of the Board were breaching their fiduciary
duty to advance an agenda; that the faculty abused the power dynamic between student and
teacher when sharing with students their dissatisfaction with Dr. Betters and that there were
personal vendettas at play by some bad actors.

262.    The letter further stated that "[c]hange and growth can be difficult. However, we
sit aghast at the vitriol and venom that has overtaken the Nardin Community as it grapples with
this difficult moment…[w]e note that there was no commensurate outrage in the summer of 2020
when Oppressed at Nardin revealed the systemic and personal racism that Black girls and girls of
color at Nardin suffered."

263.    At the same time, a former Trustee at Nardin came forward to allege that her name was fraudulently added to the Nardin Together petition. As she detailed on her personal Instagram:

> Today a rogue group of parents, staff, Trustees, students, alumnae and, most embarrassingly, former leadership are protesting current executive leadership of Nardin. Today I was told my name was *falsely* added to a protest letter I haven't seen. I reject this and have to write this post to go on record that the group behind this effort are frauds. They lack the maturity to know their behavior makes them look as they are - the proverbial turnips on the truck who are amateurs, provincial, small and deceitful. They aren't famed #NardinGirls who achieve for the betterment of our world. When we walked through the doors to enter this chapel we had to get right with God - clean conscience, moral, ethical, truthful. This rogue group would set off alarms at the doors and would be denied entrance. I will wait for facts. I will wait for governance to complete its assessment. Plagiarism still gets an F grade. #buffalo

264.    Yet, as tensions continued to rise, many Nardin employees, parents and Board members continued publicly spreading lies and misinformation about Dr. Betters online to further enflame the situation.

265.    Denis Coakley ("Mr. Coakley"), a religious teacher at Nardin, posted disturbing Facebook posts with thinly veiled threats against Dr. Betters.  One of the posts included a photograph of a knife, and another faculty member, Rosalie Sperrazza, put Dr. Betters' initials in the comments of the post.

266.    Dr. Betters complained and filed a police report.  The Board of Trustees directed that no action be taken against Mr. Coakley.  He, quite ironically, remains a religion/theology teacher at Nardin to this day.

267.    Before the investigation was concluded, both Dr. Betters and her child began receiving death threats, with one email sent from a group identifying itself as a group of parents and alumni stating that Dr. Betters had until a specific date to "never show [her] face again" and

included a photograph of her. Dr. Betters requested a forensic investigation to determine who

sent the email, but she was removed from her position before the investigation could occur.

Upon information and belief, Ms. Sullivan ordered that all forensic investigations be stopped.

## VII.    DR. BETTERS IS UNLAWFULLY TERMINATED

268.    Given the mounting hostility, online smear campaign and death threats, it became

clear to Dr. Betters that her detractors would stop at nothing, including harming her child, to

force her out.

269.    As a result, in May 2023, Dr. Betters agreed to collaborate in a transition from her

role as President. As part of the transition, the nine Board trustees, who very publicly breached

their fiduciary duty to Nardin and engaged in despicable and unlawful behavior, were also asked

to resign.

270.    Two days after the transition was announced, Nardin released a brief statement

that stated: "The third-party assessment, initiated by Nardin's board of trustees, showed no

wrongdoing or misconduct on Sandra's part. We are grateful for Sandra's hard work,

professionalism, and her unwavering support of the mission of Nardin and the Daughters of the

Heart of Mary."

271.    Not surprisingly, Dr. Betters' detractors swiftly rejected the assessment without

ever reading it and publicly continued to bash Dr. Betters.

272.    Still not satisfied, Dr. Betters' detractors instantly focused their attention on the

removal of Board Chair Tish Van Dyke because she supported Dr. Betters.

273.    Reportedly, after Dr. Betters' removal, 71 Nardin families sent a letter to the

Board threatening to withhold tuition deposits if Dr. Betters' supporters remained on the Board.

274.     Despite DHM publicly supporting Dr. Betters and Board Chair Van Dyke by reiterating on numerous occasions that neither engaged in any wrongdoing, at the end of the day, DHM chose money over justice.  On May 29, 2023, DHM announced that it had made the decision to remove the entire Board of Trustees, including Board Chair Van Dyke.

275.     Ironically, Ms. Sullivan, the former president who left the Academy in a state of financial and academic disarray, was then named the Board Chair and asked to form a new Board of Trustees.

276.     Several of the former Board members were then chosen to return, including Mr. Chiampou, Mr. Jacobs, Ms. Sullivan and Mr. Uba.

277.     Among others, Ms. Sullivan also named new Board Members, including Leslie Keane, the same donor who threatened to withhold any donations until Dr. Betters and Board Chair Van Dyke were removed.

278.     The new Board, led by Ms. Sullivan, immediately made the decision to terminate Dr. Betters from her position effective June 16, 2023 despite Dr. Betters and the Academy being in the midst of finalizing details of her separation.  They did so despite knowing that the BSK Report found absolutely no misconduct or wrongdoing by Dr. Betters.

279.     The Board also did so in violation of Dr. Betters' Employment Agreement, which required that if she was terminated without cause, Dr. Betters was entitled to a specific severance if she signed a waiver and release that released any and all claims against Nardin Academy.

280.     After Nardin Academy terminated Dr. Betters, and in breach of her Employment Agreement, the Academy never provided her with a general release conforming to the terms of the Employment Agreement.  Instead, the Academy provided Dr. Betters with a Separation Agreement that included terms that went far beyond a general release of the Academy.

281.    First, the Separation Agreement contained a release of claims against not only the Academy, but also "[a]ffiliates ("Affiliates" means a parent, subsidiary or other related corporation or entity which controls Employer, is controlled by Employer or is under common control with Employer, where "control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a corporation or entity, whether through management authority, equity interest or otherwise) and all of Employer's and its Affiliates' respective current and former employees, directors, officers, trustees, agents, attorneys, members, partners, shareholders, insurers, representatives, predecessors, successors and assigns, all persons acting with or on behalf of them, and all employee benefit plans and programs sponsored by any of them and their service providers, administrators and fiduciaries (as the term fiduciary is defined under the Employee Retirement Income Security Act of 1974, as amended)."  The Academy was not entitled to demand that Dr. Betters sign a release that was far broader than what was set forth in Dr. Betters' Employment Agreement.

282.    Second, the Separation Agreement contained confidentiality and non-disparagement provisions that far exceed a general release as well.  The Academy was again not entitled to present them to Dr. Betters based on the terms of her Employment Agreement.

283.    Third, the non-disparagement provision in the Separation Agreement constitutes an impermissible restraint on Dr. Betters' ability to obtain alternative comparable employment of her choice, as she would undoubtedly need to speak negatively regarding the Academy in explaining her departure from the School, particularly given the smear campaign to which she was publicly subjected.

284.    Under these circumstances, the Academy's failure to pay Dr. Betters the severance to which she was contractually entitled constitutes a breach of her Employment Agreement.

285.     As Ms. Sullivan and many other members of the Board are aware, Dr. Betters discovered their financial malfeasance while serving as President.  They were desperate to remove her as quickly as possible.  Dr. Betters' leadership style and commitment to DEI, which angered parents and faculty members, were simply the easiest way to rile up the community and ensure that Dr. Betters was unable to discover any additional malfeasance.

286.     The Board members seeking Dr. Betters' removal not only breached their fiduciary duties, but also engaged in retaliation against her for repeatedly raising concerns about the Academy's improper, unauthorized and conflict-ridden spending.

287.     The Board's actions were unlawful, and while Nardin Academy originally attempted to temper the vitriol of the detractors, it ultimately put profit first and caved to the demands of the School's benefactors and parents.

288.     The Defendants must be held accountable for their decisions to scare and intimidate Dr. Betters, impugn her character and reputation and interfere with her future career.

## FIRST CAUSE OF ACTION
### (Retaliation under Section 1981)
*As to Defendants Nardin Academy, Ms. Sullivan, Mr. Lawley, Mr. Ewing, Mr. Jacobs and Mr. Chiampou*

289.     Plaintiff hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

290.     As described above, Defendants Nardin Academy, Ms. Sullivan, Mr. Lawley, Mr. Ewing, Mr. Jacobs and Mr. Chiampou have retaliated against Dr. Betters in violation of Section 1981 by, among other things, actively interfering with her personal and professional relationships, defaming her by spreading lies about her and/or terminating her because she opposed discriminatory hiring practices prohibited under Section 1981.

291.    As a direct and proximate result of the unlawful retaliatory conduct taken by Defendants in violation of Section 1981, Dr. Betters has suffered, and continues to suffer, economic damages, loss of opportunity, loss of reputation, physical harm and mental anguish and emotional distress for which she is entitled to an award of damages.

292.    The unlawful retaliatory conduct taken by Defendants constitutes reckless, malicious, willful and wanton violations of Section 1981 for which Dr. Betters is entitled to an award of punitive damages.

<u>SECOND CAUSE OF ACTION</u>
**(Unlawful Retaliation under New York Not-for-Profit Corporation Law § 715-b, *et seq*.)**
*As to Defendant Nardin Academy*

293.    Plaintiff hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

294.    New York Not-for-Profit Corporation Law § 715-b provides that every applicable organization have a policy confirming that "no director, officer, employee or volunteer of a corporation who in good faith reports any action or suspected action taken by or within the corporation that is illegal, fraudulent or in violation of any adopted policy of the corporation shall suffer intimidation, harassment, discrimination or other retaliation or, in the case of employees, adverse employment consequence."

295.    Nardin either does not have a policy compliant with §715-b or has a written policy that is compliant but does not follow such policy in practice.  Furthermore, Nardin Academy and its Board of Trustees are on notice of and have acquiesced to non-compliance with such policy by unlawfully terminating Dr. Betters.

296.    By the conduct described above, in response to Plaintiff's protected complaints and/or reports, the Nardin Academy subjected Plaintiff to a hostile work environment and the adverse employment actions set forth above.

297.    As a result of Nardin Academy's conduct, Plaintiff has suffered economic and noneconomic injury for which she is entitled to monetary and other damages in an amount to be determined at trial, together with an award of punitive damages in an amount to be determined at trial and any and all other available relief including attorneys' fees and costs.

### THIRD CAUSE OF ACTION
**(Breach of Contract)**
*As to Defendant Nardin Academy*

298.    Plaintiff hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

299.    As described above, Defendant Nardin Academy breached Dr. Betters' Employment Agreement by failing to pay Dr. Betters the severance to which she is entitled upon a termination without cause.

300.    As a direct and proximate result of the unlawful conduct taken by Defendant Nardin Academy in breach of Dr. Betters' Employment Agreement, Dr. Betters has suffered, and continues to suffer, economic damages for which she is entitled to an award of damages.

301.    The unlawful breach of Dr. Betters' Employment Agreement constitutes reckless, malicious, willful and wanton violations of the law for which Dr. Betters is entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Unlawful Retaliation under the NY Whistleblower Law, § 740)
*As to Defendant Nardin Academy*

302.    Plaintiff hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

303.    The NY Whistleblower Law prohibits any employer from retaliating against an employee for reporting a reasonable violation of any law, rule or regulation.

304.    Dr. Betters reasonably believed that the Academy violated federal and state law when it knowingly and falsely reported the number of school days to the State of New York, knowingly used PPP funds for unlawful purposes and knowingly engaged in a fraudulent tax scheme to benefit an Academy benefactor.

305.    Dr. Betters disclosed her reasonable belief to those with authority to investigate, discover or terminate the misconduct on multiple occasions.

306.    The Nardin Academy took adverse actions against Dr. Betters, including, among other things, engaging in a concerted effort to harass her, terminating her employment and violating her Employment Agreement.

307.     Dr. Betters' protected activity was a contributing factor in Defendant's decision to take adverse actions against her.

308.    As a direct and proximate result of Defendant's unlawful retaliatory conduct, Dr. Betters has suffered, and continues to suffer harm, including but not limited to, restricted employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, injury, pain, mental anguish and other economic and non-economic damages, for which she is entitled to an award of damages to the greatest extent permitted under law.

**FIFTH CAUSE OF ACTION**
**(Violation of the New York False Claims Act, Art. 13 of the NYS Finance Law)**
*As to Defendant Nardin Academy*

309.    Plaintiff hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

310.    The NY False Claims Act imposes liability for knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval; knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and conspiring to commit of violation of these provisions.

311.    Dr. Betters discovered that despite not requiring students to attend the minimum numbers of days required to receive state funding, Nardin Academy continued to receive funding reserved for schools that make a written representation that students attend a minimum of 180 days each school year.

312.    Upon information and belief, the Academy knowingly defrauded the State of New York by submitting falsified documentation about the number of school days attended by students in order to receive funding reserved only for schools that meet the state requirement of 180 days.

313.    Dr. Betters disclosed her reasonable belief to those with authority to investigate, discover or terminate the misconduct on multiple occasions.

314.    Defendant Nardin Academy took adverse actions against Dr. Betters, including engaging in a concerted effort to harass her, terminating her employment and violating her Employment Agreement.

315.    Dr. Betters' protected activity was a contributing factor in Defendant's decision to take adverse actions against her.

316.    As a direct and proximate result of Defendant's unlawful retaliatory conduct, Dr.

Betters has suffered, and continues to suffer harm, including but not limited to, restricted

employment opportunities, humiliation, embarrassment, reputational harm, emotional and

physical distress, injury, pain, mental anguish and other economic and non-economic damages,

for which she is entitled to an award of damages to the greatest extent permitted under law.

### SIXTH CAUSE OF ACTION
**(Unlawful Retaliation under New York State Human Rights Law § 290, *et seq*.)**
*As to Defendants Nardin Academy, Ms. Sullivan, Mr. Jacobs and Mr. Chiampou*

317.    Plaintiff hereby repeats and re-alleges each and every allegation in the preceding

paragraphs as if set forth fully herein.

318.    NYSHRL provides that it is an unlawful discriminatory practice to retaliate

against any person because he or she has opposed specific unlawful practices or filed a

complaint.

319.    Defendants Nardin Academy, Ms. Sullivan, Mr. Jacobs, and Mr. Chiampou

retaliated against Dr. Betters in violation of NYSHRL by, among other things, actively

interfering with her personal and professional relationships, defaming her by spreading lies about

her and terminating her because she opposed discriminatory hiring practices prohibited under the

NYSHRL.

320.    As a direct and proximate result of the unlawful retaliatory conduct taken by

Defendants in violation of the NYSHRL, Dr. Betters has suffered, and continues to suffer,

economic damages, loss of opportunity, loss of reputation, physical harm and mental anguish and

emotional distress for which she is entitled to an award of damages.

321.    The individual Defendants actively participated in and/or aided and abetted the

unlawful conduct described herein.

322.    As a result of Defendants' conduct, Plaintiff has suffered economic and non-economic injury for which she is entitled to monetary and other damages in an amount to be determined at trial, together with an award of punitive damages, and any and all other available relief.

**SEVENTH CAUSE OF ACTION**
**(Defamation)**
***As to Defendants Ms. Lorence, Mr. Lorence and Ms. Forton-Barnes***

323.    Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

324.    As described above, Defendants Ms. Lorence, Mr. Lorence and Ms. Forton-Barnes published numerous false statements online which tend to impugn Dr. Betters in her profession and otherwise have a harmful effect on her, including that Dr. Betters engaged in improper research within her dissertation, was previously terminated, pressured a teacher to change her child's grade and was responsible for harming Nardin Academy.

325.    Defendants' statements were false at the time they were made, and Defendants knew they were false.

326.    Defendants' statements constitute defamation per se because they plainly and openly disparage Dr. Betters' professional reputation and otherwise subject her to ridicule, contempt or disgrace.

327.    As a result of Defendants' defamation per se, Dr. Betters has suffered damages in an amount to be determined at trial.

328.    Defendants' defamatory statements were malicious, willful, wanton and done with reckless disregard for Dr. Betters' rights.  As such, she is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of New York;

B.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

C.    An award of damages against Defendants in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress;

D.    An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

E.    Reinstatement;

F.    An award of punitive damages, if applicable, in an amount to be determined at trial;

G.    An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and,

H.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: August 24, 2023
      New York, New York

**WIGDOR LLP**

By: _____
      Michael J. Willemin
      Monica Hincken (admission for *pro hac vice* to be filed)

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
mwillemin@wigdorlaw.com
mhincken@wigdorlaw.com

*Attorneys for Plaintiff*